UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT § <br> OF J.R. NICHOLLS, LLC AND KM SHIP § <br> CHANNEL SERVICES, LLC AS OWNER § <br> AND OPERATOR OF THE M/V J.R. NICHOLLS § <br> FOR EXONERATION FROM OR LIMITATION § <br> OF LIABILITY § | CIVIL ACTION H-10-449 |

**FINDINGS OF FACT AND CONCLUSION OF LAW**

This is a limitation of liability action brought by J.R. Nicholls, Inc., and KM Ship Channel Services LLC (collectively "petitioners"), as owner and operator, respectively, of a push boat, the J.R. NICHOLLS, which sank on February 10, 2010, in the Houston Ship Channel. After a non-jury trial on the merits, the court makes the following findings of fact and conclusions of law and finds that petitioners are the owner and operator of the J.R. NICHOLLS, but that petitioners are not entitled to limit their liability under the Limitation of Liability Act ("the Act"), 46 U.S.C. § 30505(a). The court therefore finds in favor of claimants and against petitioners on the issue of limitation of liability.

**FINDINGS OF FACT**

1. At all material times to this action, J.R. Nicholls LLC was the registered owner of the M/V J.R. NICHOLLS and Ship Channel Services LLC was the operator responsible for her manning, supplying, navigating, operation and maintenance. (See JR NICHOLLS Certificate of Documentation and Bill of Sale, Petitioners' Exs. 1 and 2).

2. The J.R. NICHOLLS is an all-welded steel, twin screw designed inland towboat built in 1978 powered by two Caterpillar Model C12 diesel engines with hull dimensions of 60'-5" x 21"-8' x 10'-9".

3. The vessel, J.R. NICHOLLS, is an uninspected inland towing vessel of the United States of America, bearing Official No. 590031.

4. The post-casualty value of the J.R. NICHOLLS was Twenty Five Thousand Dollars ($25,000.00).

5. There was no freight earned or pending by the J.R. NICHOLLS at the time of the February 10, 2010 casualty at issue.

6. On February 10, 2010, the vessel J.R. NICHOLLS was operating as a light boat (i.e., not pushing a barge) in the Houston Ship Channel with a Captain, Louis Hildebrand, and four additional crew members, Steven Seymore, Jason Krueger, John Gutierrez, and Marvin Thompson.

7. At approximately 2230 hours on February 10, 2010, the J.R. NICHOLLS was passing astern of two G&H Towing harbor tugs, the M/V ATLAS and the M/V ANDREW K, which were assisting the docking of the M.T. MISS LUCY at the Woodhouse dock.

8. As the J.R. NICHOLLS was passing astern of the two G&H Towing tugs she encountered the wheel wash of the ANDREW K, which was operating full ahead. Dkt. 34-5 at 3.

9. The J.R. NICHOLLS took an abrupt, almost 90 degree list to port (the video, although dark and not revealing great detail, showed the vessel's running light going from upright to water level within a few seconds). The J.R. NICHOLLS flooded and sank within a few minutes. Captain Hildebrand and the remaining crew were able to escape and survived, but Steven Seymore was found in the engine room when the vessel was raised.

10. In the four weeks proceeding February 10, 2010, the J.R. NICHOLLS had been in the shipyard January 10, 2010, through January 28, 2010, and February 1, 2010, through February 2, 2010. *See* Deposition of Jason Bludworth, p. 24.

11. The Captain of the J.R. NICHOLLS reported several issues with the vessel in the months preceding the casualty, including fore and aft void spaces filling with water, and a noticeable list to the vessel when it was being operated light boat or in turns. There was water noted in the aft void space on the day of the casualty, and crewmen pumped water out of the void space earlier that day.

12. On February 12, 2010, J.R. Nicholls LLC and KM Ship Channel Service LLC timely filed a complaint for exoneration from or limitation of liability as a result of the sinking of the J.R. NICHOLLS.

13. The J.R. NICHOLLS, prior to and at the time of the sinking, had dogs on its watertight doors which were "frozen" and/or inoperable, and the seals around the watertight doors were painted and hard.

14. At the time of the sinking, the frame on the starboard engine room watertight door was inoperable without the use of a "cheater bar" due to a bent frame that existed for at least several months prior to the casualty.

15. Petitioners' shore side personnel were aware of the problems with the water tight doors, and the practice of pinning them open while operating in the Houston Ship Channel.

16. Petitioners had a policy of permitting pushboats to operate with their watertight doors open while underway so long as they were in the Houston Ship Channel, and not on "open water."

17. Petitioners scheduled repairs to the watertight doors on the J.R. NICHOLLS one month prior to the accident, but then cancelled those repairs before they could be made.

18. When raised after the sinking, the watertight doors on the J.R. NICHOLLS were pinned open, which confirms the court's finding that the watertight doors were pinned open at the time of the casualty.

19. Modifications were made to the fuel tanks shortly before the casualty, at the direction of petitioners' corporate representative, Jason Bludworth. A 6"-8" hole was cut in the bulkhead separating the two fuel tanks in the bow of the boat, thereby increasing the free surface effect at the time of the incident, particularly since the tank had just been filled.

20. The J.R. NICHOLLS was built with a water tank that extended the full breadth of the vessel, and lacked any baffles that would have decreased the free surface effect. Petitioners were aware of this condition, and their expert identified this as a design flaw that adversely affected stability.

21. When raised after the sinking, water was found in void spaces that were intended to be watertight.

22. The J.R. NICHOLLS had a history of water leaking into void spaces and collision spaces due to a lack of integrity of the metal which had "wasted." Specifically, the bulkhead between the after-void and the potable water tank was wasted and potable water was leaking into the void. Thus, the boat effectively had two "slack" water tanks allowing water to slosh back and forth with the boat's movement, thereby increasing the "free surface" effect which negatively impacted the stability of the J.R. NICHOLLS.

23. At the time of the casualty, the boat was being operated "down by the head," as was Captain Hildebrand's custom, meaning that the boat had more draft forward than aft. This reduces the forward freeboard and allows more water to be pushed up in front of the boat, and to flow up and

onto the deck, while the boat is being operated. Shore side personnel for petitioners were aware of, or should have been aware of, Captain Hildebrand's custom of operating the boat "down by the head."

24. At the time of the incident, the J.R. NICHOLLS was unstable due to a combination of excessive free surface effect and improper operation in a "down by the head" fashion. The boat's free surface effect was a result of several things, including a lack of baffles in the water tank, leakage into void spaces, and the presence of a pass-through between the fuel tanks. The boat's stability was further adversely impacted by being operated "down by the head" which caused more water to swamp the front of the boat when it encountered the ANDREW K's wheel wash than otherwise would have occurred had it been operating normally.

25. The rapidity with which the J.R. NICHOLLS capsized is evidence that its stability was severely compromised at the time of the casualty.

26. Petitioners had a policy of permitting pushboats to operate with watertight doors open while underway so long as they were in the Houston Ship Channel, and not on "open water."

27. The United States Coast Guard issued repeated advisories recommending that all vessels should have watertight doors closed when in operation, whether in the Houston Ship Channel or otherwise.

28. The J.R. NICHOLLS likely would not have sunk after encountering the prop wash of the ANDREW K had its watertight doors been closed, even in light of its severely compromised stability.

29. The seaworthiness of the J.R. NICHOLLS was adversely impacted by having its watertight doors open while operating in the Houston Ship Channel, because this kept the vessel from recovering from capsizing after encountering wheel wash from the ANDREW K.

30. At the time of the incident, the J.R. NICHOLLS was not reasonably fit for its intended purpose due to a combination of severely impaired stability and the watertight doors being pinned open while operating.

31. The J.R. NICHOLLS was unseaworthy at the time of the incident, and the causes and reasons for it being unseaworthy were known to petitioners' shore side personnel.

## CONCLUSIONS OF LAW

1. J.R. NICHOLLS LLC and KM Ship Channel Services LLC are vessel owners/operators for purposes of the Limitation of Liability Act and can petition to limit their liability for damages arising out of the sinking of the J.R. NICHOLLS. 46 U.S.C.A. § 30505, 30511.

2. Petitioners must prove the value of the vessel at the conclusion of the voyage. *Coryell v. Phipps*, 317 U.S. 406, 409 (1943). Petitioners have established that the value of the J.R. NICHOLLS at the conclusion of the voyage was $25,000.

3. To determine a vessel owner's entitlement to limitation, a court must first determine whether the claimant has proven "that negligence or unseaworthiness caused an accident," and then "an owner seeking limitation must show it lacked privity or knowledge of the condition." *Gateway Tugs, Inc. v. Am. Commercial Lines, Inc.* ( *In re Kristie Leigh Enters., Inc.*), 72 F.3d 479, 481 (5th Cir. 1996) (footnote omitted). *See also Trico Marine Assets Inc. v. Diamond B Marine Services Inc.*, 332 F.3d 779, 789-90 (5th Cir. 2003).

4. A shipowner has an "absolute nondelegable duty to provide a seaworthy vessel" and "unseaworthiness is predicated without regard to fault or the use of due care." *In re Signal Intern., LLC*, 579 F.3d 478, 497 (5th Cir. 2009) (citations and internal quotations omitted).

5. In order to be seaworthy, a vessel must be "reasonably suited for the purpose or use for which [it is] intended." *Id.*, quoting *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir.1988) (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960)).

6. The J.R. NICHOLLS was unseaworthy due to a combination of a lack of stability, and a lack of proper training or instruction to the crew to keep watertight doors shut while in operation, and the failure to remedy the practice of operating the pushboat "with the head down." This unseaworthiness was a proximate cause of the sinking of the J.R. NICHOLLS. *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991) ("[A] plaintiff must prove that the unseaworthy condition played a *substantial part* in bringing about or actually causing the injury" (quotation marks and citation omitted, emphasis supplied)); *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 813 F.2d 634, 639 (4th Cir. 1987) ("Only conditions of unseaworthiness that contribute to the [casualty] are relevant to determining whether the shipowner is entitled to limitation.").

7. In considering whether a vessel owner has proven that it lacked privity or knowledge of a condition, the owner is deemed to be in privity and knowledge both of facts known to managing agents, and facts that it could have discovered through reasonable investigation. *In re Signal Intern.*, 579 F.3d at 497; *Brister*, 946 F.2d at 358 (privity "deemed to exist if the shipowner has the means of obtaining knowledge, or if he would have obtained the knowledge by reasonable inspection.")

7

8. "Managing agents" working for petitioners, including Jason Bludworth and Antoinne Flagg, were aware of the unseaworthy condition of the J.R. NICHOLLS, and this knowledge and privity is imputed to the petitioners. *Id*. 579 F.3d at 496-97.

9. Petitioners have, accordingly, failed in their burden of proving that they lacked privity or knowledge of the unseaworthy condition, and are not entitled to limitation of liability under the Act.

10. A vessel owner will not be denied limitation of liability "merely on errors in navigation or other negligence by master or crew." *Trico Marine*, 332 F.3d at 790. The record establishes that Captain Hildebrand was negligent in encountering the wheel wash that capsized the J.R. NICHOLLS both for failing to monitor appropriate radio channels, and for failing to recognize the hazard posed by the wheel wash of a large tug working in a narrow area of the channel. However, as was the case in *Trico Marine*, "the present case presents far more than mere navigational errors." *Id*. The J.R. NICHOLLS would not have been rolled on its side so easily absent severe issues with its stability, and would not have sunk so quickly (if at all) had it not been operating with its watertight doors pinned open. Thus, this is not a case where a mere navigational error was the *sole* cause of the accident, and petitioners' attempt to place all of the blame on Captain Hildebrand in this respect does not change the court's ruling because the unseaworthiness of the J.R. NICHOLLS played a substantial part in the incident regardless of any other potential concurrent causes of the casualty. *Brister*, 946 F.2d 355.[1]

---

[1] For the same reason, petitioners' insistence that the ANDREW K failed to post a proper lookout and failed to reduce its wheel wash while the J.R. NICHOLLS passed astern are, even if true, irrelevant to the issue of petitioners' liability for their part in causing the casualty.

11. The court also notes that the purpose of the Act would not be served by a finding of limitation in this case because the Act was meant to address a situation, and the attendant risk to an owner, that is simply not present where a pushboat is operated in a harbor and within a few miles of its own dock. In a recent case in the United States District Court for the Eastern District of New York, the court noted:

> The nature of the vessel's voyages—providing taxi service over the New York ports' waterways—suggests the opportunity for more detailed control by the owner and responsibility of its executives, who were virtually on the scene, to supervise the vessel's ongoing seaworthiness more closely than if the vessel were on the high seas. The underlying theory of limited liability as a policy to encourage investment in risky, long sea voyages has little relevance to the Marguerite's meanderings within New York harbor, in sight of its home port.

*Haney v. Miller's Launch, Inc.*, 773 F. Supp. 2d 280, 289-90 (E.D. N.Y. 2010). This court agrees. The J.R. NICHOLLS was operated within the Houston Ship Channel at the time of the incident, and the captain and crew were in daily, close contact with ownership and supervisory personnel. This is simply not a case where the purpose of the Act would be served by a limitation of liability, and, in any event, the facts do not support limitation.

## Conclusion

After a non-jury trial on the merits, and on the basis of the findings of fact and conclusions of law set forth above, the court finds that petitioners are not entitled to limit their liability under the Limitation of Liability Act ("the Act"), 46 U.S.C. § 30511. The court therefore finds in favor of claimants and against petitioners on the issue of limitation of liability.

Signed at Houston, Texas on May 17, 2012.

_____
Gray H. Miller
United States District Judge